CHICAGO TITLE & TRUST COMPANY, Trustee, *et al.*, Plaintiffs-Appellants, *v.* THE CECO CORPORATION *et al.*, Defendants-Appellees.

First District (4th Division)    Nos. 79-2061, 79-2076 cons.

Opinion filed December 23, 1980.—Rehearing denied January 22, 1981.

Robert R. Tepper and Mitchell H. Macknin, both of Chicago (Rosenthal & Schanfield, of counsel), for appellants.

Edward L. Foote and David S. Acker, both of Chicago (Winston & Strawn, of counsel), for appellees.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

Plaintiffs, Chicago Title and Trust Company and E. N. Maisel and Associates, brought this action in the circuit court of Cook County against defendants, Ceco Corporation and Burlington Northern, Inc., seeking specific performance of a contract for the sale of real property allegedly entered into between plaintiffs and Ceco Corporation. At the conclusion of plaintiffs' case-in-chief, the trial court, sitting without a jury, granted defendants' motion for judgment. From this judgment, plaintiffs appeal.

We affirm.

The principal parties involved in this action are E. N. Maisel and Associates and Ceco Corporation. We will refer to these parties as the Maisel Partnership and Ceco. Essentially, the Maisel Partnership alleged it had entered into a contract with Ceco to buy real property owned by Ceco and located in the Town of Cicero. Chicago Title and Trust and the Burlington Northern, Inc., play only a peripheral role. Chicago Title and Trust was to be the land trustee of the property holding it in trust for the benefit of the Maisel Partnership. Burlington Northern is a buyer of the property from Ceco and purchased the property with alleged knowledge of Ceco's dealings with the Maisel Partnership, and thus Burlington's rights apparently are subject to the outcome of this case.

The events leading up to the filing of this action span a period of a year and a half and involve many meetings, telephone conversations, and written correspondence between the representatives of the Maisel Partnership and Ceco. We will set out here the Maisel Partnership's evidence in chronological order, listing the important dates and the events which occurred on those dates.

### March 1977 to February 1978

The Maisel Partnership becomes interested in purchasing Ceco's property. At the time the Ceco property has on it an abandoned building and an office building used by Ceco. The Maisel Partnership represents to Ceco that it is in the business of developing shopping centers and, in particular, in the business of developing K-Mart stores. (The Maisel Partnership has developed K-Mart stores for many years though neither has ever been obligated to the other until the Maisel Partnership has acquired the necessary property and leased it to K-Mart.) Ceco represents to the Maisel Partnership that it is interested in selling the property and moving its offices elsewhere.

The Maisel Partnership does preliminary studies of the property to see if it is suitable for a shopping center. It draws up preliminary plans and K-Mart examines the property and tells the Maisel Partnership it would be favorable for K-Mart to lease part of the property if the Maisel Partnership can develop the property as planned and acquire the other businesses necessary to fill the shopping center.

The Maisel Partnership and Ceco begin negotiations for the sale. However, some substantial problems exist, among which is the present zoning of the property. The applicable zoning ordinance of the Town of Cicero does not allow a shopping center on the land. The Maisel Partnership does not want the property unless it can get the zoning it needs. The parties tentatively agree to draw up a contract which will include a provision allowing the Maisel Partnership to opt out of the contract if the necessary zoning change cannot be obtained while simultaneously requiring substantial efforts to be made by the Maisel Partnership to get the zoning change so that the Maisel Partnership does not have a one-sided bargain. Other problems include the price and terms of payment and the length of time that Ceco can continue to occupy the property.

The Maisel Partnership's attorney drafts a contract. It sets out all the necessary elements of such a contract including closing requirements, title insurance, escrow accounts, survey requirements, soil testing contingencies, etc. It also includes the zoning contingency allowing the Maisel Partnership to opt out of the contract if the zoning change is not acquired within a reasonable time. The draft does not include an agreed price to be paid but has blanks for filling this in. The draft is sent to Ceco.

### February 28, 1978

A meeting is held between representatives of the Maisel Partnership and Ceco. Among those attending are attorney David Malfar for the Maisel Partnership, Elmer Gustafson, who is chairman of the board and chief executive officer for Ceco, and the individual real estate agents for the two parties.

Gustafson tells Malfar that he has seen the contract and it appears to be satisfactory but wants to know why there is no price quoted in the contract. Malfar explains that the Maisel Partnership has previously dealt with the real estate agent representing Ceco and suffered a bad experience. The Maisel Partnership was negotiating through this agent to buy a piece of property from the Victor Comptometer Company. After extensive negotiations, the Maisel Partnership finally quoted a price and thereafter the Victor Company suddenly received various offers at a higher price. Malfar says he believes the real estate agent used the quoted price for bid-shopping and he does not want the Maisel Partnership to suffer the same experience again.

Upon hearing this, Gustafson assures Malfar he is dealing with honorable and reliable people. Malfar asks Gustafson that if they reach agreement as to price does Gustafson have the power to bind Ceco to the sale. Gustafson says he does and he considers the contract to be satisfactory, though the language will have to be gone over by Ceco's lawyers.

Malfar then asks whether Gustafson has tried to sell the property to the Burlington Northern which owns property next to the Ceco property and seems to be a natural candidate as a buyer. Gustafson says he has but Burlington is not interested.

After further discussion, Malfar says the Maisel Partnership will pay $3.8 million in two installments. Gustafson agrees to this. The parties then discuss many of the details of the contract and agree to some changes. Towards the end of the meeting, Gustafson asks how Malfar will proceed with the zoning. Malfar explains his normal procedure for obtaining zoning changes. Gustafson tells Malfar that his method is too slow, that he, Gustafson, knows how the town board works and he can get it done much faster than Malfar proposes.

After further discussion, Malfar agrees to change the zoning contingency in a particular manner and tells Gustafson that the Maisel Partnership will be ready, after the contract is signed, to proceed with the zoning hearings before the town board at any time and in any manner Gustafson wants. Gustafson tells him, "Fine," put the necessary changes in the contract "and we have got a deal."

### March 1, 1978, to April 18, 1978

Malfar meets with Hugh King, an attorney with Jenner and Block. Ceco has retained Jenner and Block to assist it in making the final agreement. Malfar and King discuss a second draft of the contract that has been prepared by Malfar. The new contract has the parties agreeing to cooperate with each other and use their best efforts to obtain the zoning change. The contract allows the Maisel Partnership 270 days in which to obtain the zoning change. The 270 days is to begin to run after certain

preliminary matters required by the contract are carried out. If zoning is not obtained within the 270 days both parties have the right to terminate the contract unless, in the alternative, the buyer elects to waive the zoning contingency and buy the property or pay certain sums to extend the 270-day period.

King tells Malfar that he has made a cursory study of the contract and is concerned about the zoning contingency. He believes it gives the Maisel Partnership a free option. He wants a specific zoning standard drafted so that if that standard is approved by the town board, the Maisel Partnership will be bound. He also says that he wants language in the contract giving Ceco the option to participate in the zoning hearings. Malfar agrees to do this.

On March 10, 1978, the Ceco board of directors passes a resolution authorizing management to sell the property to the Maisel Partnership for $3.8 million. Thereafter, Gustafson calls Malfar to ask him how things are progressing. Malfar refuses to discuss anything with Gustafson because he has talked to King, Ceco's attorney from Jenner and Block, and he does not believe it is proper for him to talk to another attorney's client without that attorney's permission. Gustafson criticizes his attorneys and says he thinks the attorneys are moving too slow.

Thereafter, Malfar drafts a proposed zoning standard detailing all the zoning changes needed. He meets with King to discuss the standard. King objects to some of the particular items listed and Malfar explains their necessity. No specific agreement is reached.

In the middle of April, Malfar is contacted by a Jenner and Block attorney who asks Malfar if the transaction can be made a tax-free exchange. The plan is to have the Maisel Partnership buy other property that Ceco wants, and the Maisel Partnership will then transfer this property to Ceco in return for Ceco's property. By doing this, Ceco will not have to pay a capital gains tax because of the "like-kind transaction" exception to that tax. Malfar indicates he will consider it.

## April 19, 1978

A meeting is held between the representatives of the parties. Among those present are Malfar, Gustafson, and King. Also present is Emanuel Maisel, head of the Maisel Partnership, and Wes Hall, another attorney from Jenner and Block. Hall is also a member of Ceco's board of directors. Certain of the parties have copies of the latest draft of the contract prepared by Malfar which now includes the zoning standards the Maisel Partnership will seek to have passed by Cicero's town board.

Gustafson asks if anything is still left open in the contract. The parties discuss certain of the particular items in the proposed zoning changes. Hall believes some of the items are too favorable to the Maisel Partnership and

he does not believe the town board will accept them. Malfar explains the necessity for the items, indicating he is willing to take less favorable requirements but he needs the more favorable requirements to have bargaining power with the town board. The parties agree to refer the matter to Howard Kane, a real estate expert with Jenner and Block.

The 270-day zoning period is discussed. Hall believes it is too long. Malfar says that it is merely an outside time limit and he is sure he can get it done in less time. Gustafson tells Hall to "forget it," he can get the zoning done in less time. He says he knows the town board will be receptive to having the shopping center.

The parties discuss the exchange deal. Gustafson says he feels the tax-free exchange is necessary because it will help Ceco. Malfar says that if the tax-free exchange can be arranged with the Maisel Partnership paying the same amount and not incurring any significantly greater responsibilities then it will be acceptable. The parties agree that this will be the case.

Gustafson tells Maisel and Malfar that he has arranged for them to meet with the town board to set out the Maisel Partnership's zoning proposal. Maisel says it is impossible for him to go before the board without a signed contract in hand because his credibility with the town board may be jeopardized. He does not want the board to go through the trouble of changing the zoning and then discover that no shopping center will be built. If he does that to the town board, he will never be able to deal with them again. Gustafson criticizes his attorneys for not getting the final contract completed as quickly as he desires. He says he has a meeting on April 27, 1978, with the other Ceco board members and it is very important to get the contract completed before the meeting. Malfar says he will revise the contract in the way the parties desire and deliver a copy signed by Chicago Title and Trust Company, the land trustee, to Gustafson before Gustafson's meeting with the other members of the board of directors. After the meeting, Malfar is given a letter and a memo from King describing all the language changes King wants in the contract.

### April 21, 1978

Malfar and King meet. They go through the contract paragraph by paragraph. They agree on all the changes to be made, including the zoning contingency. On the proposed zoning standard, King still objects to the particular items he thinks are too favorable to the Maisel Partnership. Malfar explains that he is willing to take less favorable requirements. However, he again explains he wants the more favorable requirements so he can bargain with the town board. He tells King that the town board will undoubtedly try to make him accept less than he requests because in his experience the boards always do. With the requirements in the

contract, he will be able to bargain away the favorable requirements and end up with requirements acceptable to both the board and him. King agrees to allow the requirements to stay as they are. Malfar agrees to draft a new contract with all the changes by April 25.

Malfar gives King a draft of a letter he will include with the contract. At this time the letter is undated and unsigned. The letter says that enclosed are three copies of the contract dated April 25, 1978, along with the initial earnest money check. The second paragraph of the letter reads as follows:

> "In the event Ceco shall fail to execute and deliver to the undersigned a counterpart of the said Contract on or before 2:30 P.M. on Friday, April 28, 1978, together with appropriate certified copies of resolutions of Ceco's Board of Directors authoriz[ing] the Contract to be executed on behalf of Ceco by those officers purporting to execute the Contract on behalf of Ceco, the offer represented by the enclosed Contract will be null, void and withdrawn without further act or notice."

The remainder of the letter sets out the requirements for a tax-free exchange. Essentially, the remainder of the letter says that after execution and delivery of the formal contract, Ceco will have 30 days to prepare a tax-free exchange agreement, which agreement will impose no greater financial obligation on the part of the Maisel Partnership than the main contract and will contain the same terms as the main contract except those relating to the tax-free exchange. Failure to prepare the tax-free exchange within 30 days will constitute a waiver of such an agreement and render the main contract binding and enforceable. Ceco's signature and delivery of the letter will constitute acceptance of these conditions concerning the tax-free exchange agreement.

King reads the letter and says it looks satisfactory but if he has any corrections he will call Malfar on April 24, 1978.

### April 24, 1978

Malfar completes the redrafting of the contract. He also drafts the letter in final form and dates it April 25, 1978. Gustafson telephones him. Malfar tells him that everything is resolved and he has a final contract ready. Gustafson tells him it is urgent that he receive a copy of the contract immediately so he can have it for his meeting with the other Ceco board members. Malfar says he has not yet had the contract signed by Chicago Title and Trust but he will send him an unsigned copy and a copy of the letter he has drafted.

Malfar sends by messenger a copy of the contract and letter to Gustafson. King calls Malfar and tells him of some minor changes to make in the letter. The letter is changed accordingly.

### April 25, 1978

Malfar gets Chicago Title and Trust's necessary signature on several copies of the contract. He sends three copies of the letter dated April 25, 1978, and three copies of the contract to Jenner and Block. Jenner and Block receives these copies.

### April 26, 1978

Gustafson calls Malfar. He tells Malfar he has set up a meeting with Cicero's town board and wants Malfar and Maisel to attend. Malfar says Gustafson is "jumping the gun" because Malfar has not yet received a contract signed by Gustafson. Malfar says their agreement was that no meeting would be held until he had a signed contract in hand. Gustafson says the matter must move forward. Malfar answers he will not move forward without a signed contract. Gustafson tells him, "I have signed the contract," and that he has given it to Jenner and Block. Malfar wants to know who has the contract and offers to pick it up himself. Gustafson tells him not to do that. He says there is a problem with delivery because if he delivers a signed contract showing a purchase for cash, the I.R.S. may not accept the later exchange as a tax-free exchange. Malfar says he believes the tax law allows him to make the tax-free exchange even if a contract for cash also exists. Gustafson says he will straighten things out.

Gustafson asks Malfar if Maisel will be willing to go to the town board meeting. Malfar says he does not think he will without a signed contract.

### April 27, 1978

A meeting of the Ceco board of directors is held. As previously noted, Ceco's office building was on the property that the Maisel Partnership wanted to buy. Ceco had property in Oak Brook, Illinois, on which it planned to build its new offices. However, many of the board members had previously said they did not want to begin building in Oak Brook until the Cicero property was definitely sold. Part of this meeting is devoted to a discussion of this problem.

Gustafson presents a resolution to authorize management to begin construction in Oak Brook. Wes Hall, the attorney from Jenner and Block and a member of Ceco's board, raises an objection. He says that he believes it will be difficult and time-consuming for the Maisel Partnership to obtain the zoning it wants. He apparently thinks that, contrary to Gustafson's opinion, the rezoning of the property may take longer than 270 days and may not be acquired at all. The other board members tend to agree with him and Gustafson withdraws his proposal and drops further discussion of the Maisel Partnership contract.

After the meeting, Gusafson calls Maisel. He tells Maisel he wants

Maisel to attend the town board meeting to present the proposal for rezoning. Gustafson says he "took some heat" at the board meeting because of the zoning contingency. He wants Maisel to attend the town board meeting because he is sure that Maisel's proposal will be greeted favorably by the Cicero board members and then Gustafson can quell the fears of the other Ceco board members. Maisel asks when he will receive his contract. Gustafson says he has signed the contract and given it to Jenner and Block but he does not want a contract out yet because of the tax-free exchange problem. He assures Maisel that regardless of whether a tax-free exchange is accomplished they have a deal.

Meanwhile, another meeting occurs; this one between Malfar and Howard Kane, the real estate expert from Jenner and Block. Malfar asks Kane's help in getting the signed contract. Kane calls in Hugh King and asks if there are any problems left. King tells Malfar that he forgot to make two minor changes in the contract. Malfar admits his error and promises to submit a letter authorizing King to make the changes. Malfar says he is worried about the time he stated in his April 25, 1978, letter for acceptance of the contract by Ceco. That letter said that the contract must be accepted by April 28, 1978, or become void. Kane and King agree to Malfar's proposal for an extension of time.

### April 28, 1978

Malfar sends a letter to King. The letter authorizes King to make the minor changes discussed on April 27. The second paragraph of this letter reads:

> "Under the terms of our proposed contract, acceptance by the seller was required prior to the close of business on today's date, but it is my understanding that the principals have agreed to an extension and this letter is to confirm that fact."

### May 5, 1978

A meeting of the Cicero town board is held. Gustafson, Maisel, and Malfar attend. Gustafson introduces Maisel as the purchaser of Ceco's property. Maisel makes his presentation, laying out the plans for the proposed shopping center. The board agrees it is a good project and instructs Malfar to discuss the zoning changes with the town attorney.

Gustafson, Maisel, and Malfar leave the meeting and go to lunch. Maisel tells Gustafson he wants his signed contract. Maisel needs it to set up financing for the project and begin leasing store space. Gustafson criticizes his attorneys for being slow in drafting the tax-free exchange contract. Gustafson assures Maisel that regardless of the tax-free exchange agreement the contract will be delivered.

### May 6, 1978, to mid-June 1978

Representatives of the Maisel Partnership attend a National Shopping Centers Council. Several leases for store space in the proposed shopping center are negotiated but no formal leases are entered into though tentative agreements are made.

Both Maisel and Malfar have several telephone conversations with Gustafson. They demand the signed contract. Gustafson says he is following it up with Jenner and Block, which is having trouble with the tax-free exchange agreement.

In mid-June, Gustafson calls Maisel and tells him there is a problem, the Burlington Northern has made a better offer for the property.

### June 29, 1978

A meeting is held at which Maisel, Malfar, Gustafson and several attorneys from Jenner and Block attend. Gustafson tells Maisel of the new offer. He denies he ever said he signed the contract. Gustafson asks if Maisel can meet Burlington's offer and drop the zoning contingency. Malfar exclaims, "We've been Victorized again," referring to the previous experience with the Victor Comptometer Company.

In August 1978 Ceco sells the property to Burlington Northern for more than $4 million. This action followed.

### Opinion

Before we can decide this case, we must first determine the standard of review to be applied. The defendant's motion for judgment came at the close of plaintiff's case in a bench trial and was brought pursuant to section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 64(3)). Our supreme court recently had the opportunity to discuss this section and to set out the method of analysis to be applied by a trial court when deciding such a motion. In *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55, 407 N.E.2d 43, 45, the court said:

> "There has been some confusion in our appellate court as to whether, in ruling on the defendant's motion, in a bench trial, the trial court is to decide only if the plaintiff has made out a *prima facie* case or, instead, the court is to decide if he has met his burden of proof by a preponderance of the evidence. [Citation.] This confusion over the proper procedure to be followed by the court in ruling on a section 64(3) motion merits our comment.
>
> The *prima facie* case standard ordinarily applies to both jury and nonjury cases. In any case in which the plaintiff has failed to make out a *prima facie* case, *i.e.*, he has not presented at least some evidence on every element essential to his cause of action, the defendant is entitled to judgment in his favor as a matter of law.

When a defendant, as here, moves for judgment under section 64(3), the trial judge must first determine, as a legal matter, whether the plaintiff has made out a *prima facie* case. If he has not, the court should, without more, grant the motion and enter judgment in the defendant's favor.

If, however, the plaintiff has made out a *prima facie* case, the trial judge, in his role as the finder of fact, must then weigh the plaintiff's evidence as aforesaid. This weighing process may result in the negation of some of the evidence necessary to the plaintiff's *prima facie* case, in which event the court should grant the defendant's motion and enter judgment in his favor. On the other hand, if sufficient evidence necessary to establish the plaintiff's *prima facie* case remains following the weighing process, the court should deny the defendant's motion and proceed as if the motion had not been made."

As indicated in the *Kokinis* opinion, the trial court is to apply a two-step analysis when ruling on a section 64(3) motion. The court is first required to determine, as it would with a similar motion in a jury case, whether plaintiff has presented a *prima facie* case, *i.e.*, whether plaintiff has presented some evidence, more than a scintilla, on every essential element of his cause of action. If the court finds that plaintiff has presented a *prima facie* case, it then weighs the evidence to determine if a *prima facie* case still exists.

In the present case, the trial court applied only the first step of the analysis mentioned in *Kokinis*. The trial court specifically said in its ruling that it found plaintiffs had failed to present a *prima facie* case. In doing this, the court said it was only considering that evidence most favorable to the plaintiffs. Thus, it is clear that the trial court never reached the second step of the analysis which would have required it to weigh the evidence and then determine if a *prima facie* case still existed.

■■ We believe that the standard applied by the trial court limits our scope of review in this case. As a general rule, a trial court's decision to grant judgment for defendant at the close of plaintiff's case in a bench trial should not be reversed unless the decision is against the manifest weight of the evidence. (*City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 349 N.E.2d 399.) However, this standard of review can only be applied when the trial court has weighed the evidence and determined the credibility of the witnesses. Since the trial court did not do this, the manifest weight standard cannot be applied. We can only apply the standard applied by the trial court. Hence, we must consider only the evidence most favorable to plaintiff and determine whether it has made out a *prima facie* case. This, of course, is a question of law. See *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43.

While setting out the facts in this case, we kept this standard of review in mind. Thus, we have essentially set out plaintiff's case, ignoring certain facts brought out on cross-examination of the Maisel Partnership's witnesses which tended to attack those witnesses' credibility on testimony important to the Maisel Partnership's case.

We turn now to the crucial question presented here: did not Maisel Partnership present sufficient evidence to establish a *prima facie* case on the issue of whether a contract was entered into between the parties?

Plaintiff, the Maisel Partnership, contends that when we view all of the evidence presented by plaintiff, we must find that the essential "meeting of the minds" necessary for the formation of a contract was established by the Maisel Partnership. Plaintiff begins its argument with the February 28, 1978, meeting in which the parties agreed to the price to be paid for the property. In that meeting, Gustafson told plaintiff it was dealing with honorable and reliable people, and though some language problems in the contract had to be worked out by the lawyers, they had a "deal." Thereafter, in March, Ceco's board of directors authorized management to sell the property for the agreed price. Between March and late April 1978, Gustafson continued to represent to plaintiff that the agreement was satisfactory to him. Between April 19, 1978, and April 25, 1978, all of the details of the contract were agreed upon, with the only remaining step being the formal signing of the contract and the exchange of documents. After plaintiff sent the formal contract to Gustafson and Ceco's lawyers on April 24 and April 25 respectively, Gustafson told plaintiff he had signed the contract and induced it to take part in the town board's zoning meeting. Thereafter, in reliance on Gustafson's assurance, the Maisel Partnership negotiated leases for space in the shopping center, although none of these leases were reduced to formal agreements before Ceco withdrew from the "deal."

We believe that plaintiff misconstrues what is meant by a "meeting of the minds." It is true that in many cases, once the problem of the Statute of Frauds has been overcome, it has been held that the parties, upon agreeing to all of the essential terms of a contract, have entered into a binding and enforceable contract though no formal contract was signed or delivered by one of the parties. (See, *e.g.*, *Barton Chemical Corp. v. Pennwalt Corp.* (1979), 79 Ill. App. 3d 829, 399 N.E.2d 288; *Pendleton v. King* (1977), 55 Ill. App. 3d 1, 370 N.E.2d 590.) However, if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery. (*Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 256 N.E.2d 44; see *Brophy v. City of Joliet* (1957), 14 Ill. App. 2d 443, 144 N.E.2d 816.) Thus, the "meeting of the minds" necessary for the existence of a contract may in some cases,

because of the parties' clear expression of intent, require substantially more than the parties agreeing to all the essential terms of a contract.

In the present case, it is clear that all of the events leading up to the sending of the formal agreement on April 25, 1978, were simply preliminary negotiations. Prior to this time, both Maisel and Malfar represented that they could not proceed with the zoning hearings—an act of performance required of them under the terms of the alleged contract—until the Maisel Partnership had received a formal contract signed by Ceco. Then, in the letter of April 25, Malfar stated the formal document he was enclosing was an offer to be accepted by Ceco by signature and delivery of the contract and the letter, and delivery of a resolution by the Ceco board of directors authorizing management to enter into the contract. Malfar also stated that unless acceptance was made as required on or before April 28, 1978, the offer would become "null, void and withdrawn without further act or notice." For the Maisel Partnership to contend now that acceptance could have been accomplished by any other means belies its own clear expression of intent.

Even assuming that the Maisel Partnership could have changed the manner of acceptance required by the April 25, 1978, letter, it is clear from the testimony of Malfar and Maisel that the manner of acceptance remained unchanged. Between April 25 and April 27, 1978, Gustafson told both Maisel and Malfar that he had signed the contract. Despite this, both Maisel and Malfar demanded delivery of the contract, a demand that conformed with the terms of the April 25 letter. Then, on April 27, 1978, Malfar and the attorneys for Ceco agreed to an extension of time for acceptance. Malfar verified this agreement in a letter dated April 28. If Malfar reasonably believed that Gustafson's representations had constituted acceptance of the contract, why would he agree to an extension of time for the acceptance? Clearly, Malfar, as a representative of the Maisel Partnership, believed that acceptance could only be accomplished in the manner prescribed in the April 25 letter.

Finally, at the meeting over lunch on May 5, 1978, Gustafson assured both Maisel and Malfar that they had a "deal." Despite this, both Maisel and Malfar demanded that the signed contract be delivered, a demand that both Maisel and Malfar repeated in telephone conversations with Gustafson after the May 5 meeting. Thus, it is evident that both Maisel and Malfar continued to believe that no binding contract would be formed until the conditions for acceptance in the April 25 letter were met.

■■ Hence, it is clear that no contract could be formed in this case until execution and delivery by Ceco of the formal contract. Plaintiff presented no evidence to show that delivery occurred, and admits that no such delivery occurred. Because of this, we must hold that the Maisel Partnership failed to present a *prima facie* case. It failed to present some

evidence to show that a binding contract was entered into between the parties.

Accordingly, for the reasons noted, we affirm the judgment of the trial court.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.