Shelly FELDMAN, individually and
d/b/a Shelly Feldman Associates,
Plaintiff–Appellant,

v.

ALLEGHENY INTERNATIONAL, INC.,
et al., Defendants–Appellees.

No. 87–1594.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1987.

Decided June 17, 1988.

As Amended July 5 and Aug. 2, 1988.

Robert F. Coleman, Robert F. Coleman and Assoc., Chicago, Ill., for plaintiff-appellant.

John F. McClure, Arnstein, Gluck, Lehr & Milligan, Chicago, Ill., for defendants-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and NOLAND, Senior District Judge.*

COFFEY, Circuit Judge.

After a period of lengthy negotiations between the parties for the purchase of a group of food-related companies, the deal fell through. Allegheny eventually sold to another buyer and Feldman sued for breach of contract of sale. He also named as defendants his competing suitors, who ultimately purchased the companies, for interfering with his business prospects with Allegheny. At the close of Feldman's presentation of evidence on liability before the jury, the trial judge directed a verdict for the defendants. Having refused Feldman's request to amend the pleadings shortly before trial, the judge denied a similar request after receipt of the plaintiff's evidence, and again after rendering a directed verdict. Feldman appeals from these rulings. We affirm.

I.

In January of 1982, Allegheny International purchased Sunbeam Corporation. Soon after the acquisition, Allegheny acting on Sunbeam's behalf began to seek buyers for a group of Sunbeam's food related subsidiaries. By month's end, two potential buyers came forward. One was Frank L. Moore, then president of Frymaster, one of the five companies Sunbeam wanted to sell. The other was Feldman who gained the upper hand over his rival in late March by signing a "letter of intent" with Allegheny committing Sunbeam not to "hold discussions or negotiate with any person other than ... Feldman Associates" on the sale of the food companies "while the proposed acquisition is being pursued." The letter specified that the sale price would involve a minimum cash component of $11 million, but otherwise left open the details of the transaction. It also stated that "[i]t is understood that this is not a binding agreement and that the obligations and rights of the parties shall be set forth in the definitive agreement executed by the parties."

On March 31, 1982, the same day as the signing of the letter of intent, Sunbeam officials notified Moore and his group of the general sale terms of the letter and that Sunbeam would work toward a transaction with Feldman. Moore had previously set a date for the making of a cash offer which had been delayed until April 1. That appointment was cancelled because of Feldman's offer. On April 1, Moore wrote a letter to the president of Allegheny outlining his competing offer and requesting that it be considered by the board along with the Feldman offer. Allegheny failed to respond.

Through the months of April, May, and June of 1982, Feldman and Allegheny continued to negotiate over the terms of the sale agreement and considered six different drafts. On May 5, Allegheny met with the Moore group for about an hour. Allegheny related to Moore the cash and note components of Feldman's letter, and Moore responded indicating his continuing interest in the companies if the Feldman proposal stalled.

On the first of June, 1982, storm clouds began to hover over the Feldman/Allegheny negotiations. Feldman told Allegheny that his financier, Citicorp, had decided that the cash portion of the price would be $8.5 million. Feldman acknowledged that this figure varied from the minimum cash component specified in the letter of intent and explained that it reflected his bank's and accountant's lower estimation of the companies' book value. Allegheny responded that it would "test the water" by asking the Moore group if they were still interested but continued to negotiate with Feldman. On June 4, the Moore group made an offer to purchase the companies.

Feldman claims that he and Allegheny and their respective attorneys met on June 22 to discuss the most recent draft of the sale agreement and that the parties agreed

* The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, sitting by designation.

on each and every provision of the agreement at that meeting. Allegheny's attorney agreed to prepare a draft of the agreement incorporating the comments of both sides. After the meeting, one of Sunbeam's attorney's shook hands with Feldman and said "[l]ooks like we have a deal, fellows." As things turned out, he was overly optimistic; essential issues in valuing the companies and setting the purchase price had not been resolved nor was a definitive agreement ever executed. The June 22 "agreement" purchase price is premised on "the closing Balance Sheet, which is to be prepared as provided for in Section 3.3 hereof." Section 3.3 provides that the Closing Balance Sheet would be prepared in accordance with generally accepted accounting principles; "provided, however, that for purposes of preparing the Closing Balance Sheet, and notwithstanding that the same may be contrary to generally accepted accounting principles," certain specialized accounting principles (to be set forth in appendices to the agreement) "shall be applied" in computing specified aspects of the companies' value. Substantial assets and liabilities were subject to valuation under these to be negotiated accounting methods, including accounts receivable, inventory, pension obligations and warranty reserves. As a result of the indeterminacy in the formulae to be used in calculating the final price, the allegedly final agreement when reduced to writing left not only the purchase price blank but also the ratio between cash and debt of the payment.

In the days after the alleged "final agreement" had been reached, the parties continued to negotiate in an effort to reach a compromise on the accounting principles that would govern the transaction. None of the proposed alternatives proved mutually acceptable, and the discussions reached an impasse. On July 14, 1982, Allegheny entered into a letter of intent with the Moore group, and so advised Feldman. On October 21, Allegheny sold the companies to Welmoore Industries, Inc., a new company formed by Moore and Welbilt, a large customer of Frymaster.

## II.

■ After development of these largely uncontested facts, the district court granted directed verdict for defendants. In granting a directed verdict in diversity, federal courts apply the standard applicable under state law. *Chaulk by Murphy v. Volkswagen of America, Inc.,* 808 F.2d 639, 640 (7th Cir.1986). Under the applicable Illinois law, a directed verdict should be granted only when "all of the evidence, ... viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict ... could stand." *Pedrick v. Peoria & Eastern Railroad Co.,* 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–14 (1967). The district court applied this standard and concluded that no jury could find that Allegheny was under a contractual obligation to sell to Feldman. From our review of the record, we agree with the district court that the crucial defect in proof was the absence of a definitive signed agreement as both the Illinois statute of frauds and general Illinois contract doctrine require.

Feldman insists that he had a deal, that Allegheny agreed to all the terms of the contract on June 22, and that only the formality of execution remained. Actually signing an agreement is not necessary to bind Allegheny, argues Feldman, because of cases like *Borg–Warner Corp. v. Anchor Coupling Co.,* 16 Ill.2d 234, 156 N.E.2d 513 (1958) which hold that, although contracting parties may contemplate the execution of a formal document at a later date, that fact does not render an agreement they have reached unenforceable if it is clear that the formal contract will merely embody the agreement they have reached. Alternatively, Feldman asserts that the letter of intent created a duty to negotiate "in good faith," obligating Allegheny to agree to the June 22 contract, and thus made it binding.

■ We start with the letter of intent. Under any view of the facts, the letter of intent was the first (and as will be seen, the only possible) contract between these adversaries. It outlined Feldman's offer to

the extent possible at such a preliminary stage, and bound Allegheny to exclusive negotiation with Feldman while the sale was being pursued. This theory is in keeping with the function of and reason for a letter of intent. A complex business transaction such as the purchase of five companies requires a significant expenditure of time, effort, research and finances simply to arrive at its terms. The books of the companies must be carefully reviewed, difficult judgments of valuation must be made, financing must be secured, new corporations may have to be formed, and various timing and risk allocation issues must be spelled out in detail in the purchase and sale contract, obviously incurring substantial legal fees. Depending upon the specifics of the deal, other professional services such as accounting and financing may have to be commissioned as well. Together, all these costs in executing a complex transaction may consume more than a trivial portion of the benefit the parties hope to realize. This cost may be too high if it need be borne without some assurance that it will culminate in a sale. For if the seller undertakes much of this work, only to see the sale made to a rival, his efforts are wasted. On the other side, one might imagine the seller indifferent to the buyer's expense in assembling an offer. It might seem that the seller would prefer to simply auction off his companies to the highest bidder, whatever the expense to the potential buyers. But if potential buyers are forced to undertake duplicative research and preliminary commitments with only one among many ultimately closing a deal, each will spend less on research and other preparations and the bids thus will generally be lower. The lower bids reflect buyers' greater uncertainty in setting an offer price with less information. Furthermore, many of the expenses are shared between buyer and seller, for example, legal fees in negotiating the purchase and sale contract. The seller has a direct incentive to avoid duplicating his own efforts.

When a deal necessarily is preceded by costly groundwork, a letter of intent may benefit both the purchaser and the seller. Although much work remains to be done, indeed virtually all the details remain open, the buyer secures the seller's undivided attention as long as progress continues in ironing out the points of the transaction. Neither party has committed himself to the exchange. Both have agreed to work toward it. While success is not certain, it is more likely and the fear of wasted or duplicative effort is reduced.

Of course, the parties are entitled to shape the letter of intent as they please to fit their need. *Schek v. Chicago Transit Authority*, 42 Ill.2d 362, 247 N.E.2d 886 (1969); *A.A. Conte, Inc. v. Campbell–Lowrie–Lautermilch Corp.*, 132 Ill.App.3d 325, 87 Ill.Dec. 429, 477 N.E.2d 30 (1st Dist. 1985). They may, for example, decide to what extent the potential buyer will monopolize the attention of the seller. It is not clear how exclusive the negotiations must be to achieve the purpose of the letter. A seller might be willing to commit itself to sincere negotiations on specifics with one party and at the same time might not want to cut itself off from offers from the market. We expect that business sense would rarely counsel a total blackout of competing offers. But we need not interpret the instant letter of intent on this question; for the parties have utilized the letter of intent for another of its possible functions: elimination of future misunderstandings arising out of their negotiations.

In this case, the letter of intent stated that the parties "understood that this is not a binding agreement and the obligations and rights of the parties shall be set forth in the definitive agreement executed by the parties." Having agreed to enter into exclusive negotiations, each agreed that no step of the negotiations should be interpreted by the other as a binding contract until a definitive agreement had been reached and formally executed. The clause eliminates confusion about when a binding contract arises. Neither party needed to fear that the other would mistake an almost complete draft for a binding contract and try to foreclose the chance to change one's mind or negotiate further. Feldman now is attempting to do precisely what the letter of intent unambiguously aimed to

prevent. Allegheny never signed a document containing the terms of the June 22 meeting yet Feldman now seeks to have these terms enforced as a binding contract.

The Illinois law of contract has long recognized that the parties may agree that reduction to writing and formal execution of a contract will be necessary to create binding relations. *See Baltimore & Ohio Southwestern R.R. v. People ex rel. Allen,* 195 Ill. 423, 428, 63 N.E. 262, 263 (1902); *Brunette v. Vulcan Materials Co.,* 119 Ill.App.2d 390, 256 N.E.2d 44 (1970); *Terracom Development Group v. Coleman Cable and Wire Co.,* 50 Ill.App.3d 739, 8 Ill.Dec. 642, 365 N.E.2d 1028 (1st Dist. 1977). The underlying axiom is that parties may contract about their own negotiations. For this reason, *Borg–Warner* and related cases are irrelevant. They apply a presumption in the face of silence that formal execution is not always necessary. Here we do not face silence but rather an unambiguous statement requiring execution. Without an executed document, Feldman has no contract. *See Chicago Title & Trust Co. v. Ceco Corp.,* 92 Ill.App.3d 58, 47 Ill.Dec. 663, 415 N.E.2d 668 (1st Dist. 1980); *Terracom Development Group, supra.*

■ Ironically, even in the face of silence, Feldman would lose. True, for some Illinois contracts, reduction to writing and signature are presumed unnecessary if the terms of the agreement have been reached. But for contracts involving the transfer of real estate, statutes and case law mandate otherwise. *See Intini v. Marino,* 112 Ill. App.3d 252, 68 Ill.Dec. 12, 445 N.E.2d 460 (1st Dist.1983); *Flannery v. Marathon Oil Co.,* 75 Ill.App.3d 690, 31 Ill.Dec. 504, 394 N.E.2d 706 (1st Dist.1979). Illinois Revised Statutes ch. 59, ¶ 2 provides that no person shall be sued on a contract for the sale of lands unless signed by him or his agent.[1] Feldman does not dispute that the June 22 draft involved the transfer of substantial amounts of real property. Instead, he points to cases interpreting §§ 1–201 and 2–201 of the Illinois Commercial Code, Ill. Rev.Stat. ch. 26, which hold that any authenticating mark is sufficient to satisfy the UCC statute of frauds. After the negotiations of June 22, Allegheny's attorney agreed to prepare documents embodying the results of the day's discussions. The draft set to paper by Allegheny named Allegheny as one of the parties to be bound. Feldman argues this qualifies as an authenticating mark "equivalent to a signature." We do not agree. For one thing, the draft would presumably have identified Allegheny as one of the parties, no matter who performed the mechanics of printing the documents. Also, the authenticating mark must be made with the present intention to authenticate if it is to constitute a signature under 1–201(39). The Illinois Commercial Code provisions are designed to handle merchants' practice of stamping documents, or of signing them with initials rather than a full name, or of using printed signatures. *See Weston v. Myers,* 33 Ill. 424 (1864). They are not meant to elevate any mention of a person in the document's text to an indication of contractual acceptance. If Feldman's reading were correct, any of the drafts between the parties would constitute a signed contract as they all identify the parties to the proposed purchase and sale. More fundamentally, we doubt that even if Illinois were inclined to make dispensations to the exigencies of business practice in the sale of goods, it would extend such leniency to sales of real estate. *Compare Automotive Spares Corp. v. Archer Bearings Co.,* 382 F.Supp. 513, 515 (N.D.Ill.1974) (goods) *with Brunette,* 119 Ill.App.2d at 396–97, 256 N.E.2d at 47–48 (real estate).

■ Taking up Feldman's second theory, we find that it rests on a misconception of the letter of intent which, by now, should be clear. He suggests that with the sign-

---

1. Ill.Rev.Stat. ch. 59, ¶ 2, states:
    "No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party."

ing of the letter, Allegheny acquired a duty to negotiate in good faith which barred them from refusing to sign the June 22 agreement. As we have explained, the letter of intent was merely an agreement to negotiate, not a promise that those negotiations would be fruitful. It said as much: "It is understood that this is not a binding agreement...." At the time the letter was signed, nearly all the details remained open. As it turned out, even the main points outlined in the letter, such as the price, were "adjusted." Neither side could or would promise to close a deal at such a preliminary stage. How could it know what terms and conditions the other side would demand? "Good faith" is no guide. In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party. The proper recourse is to walk away from the bargaining table, not to sue for "bad faith" in negotiations. That is reflected in the fact that the letter explicitly provides for the possibility of stalemate. By its terms, Feldman's right to exclusive negotiation lasts only "while the proposed acquisition is being pursued." Both parties were free to end the arrangement and move on if they felt that discussions were progressing too slowly or they had reached a stalemate and believed they had better prospects elsewhere. *See Terracom*, 50 Ill.App.3d at 745, 365 N.E.2d at 1032.[2]

■ That is precisely what happened. Undisputed facts in this case demonstrate that the product of the June 22 meeting was not the "definitive agreement" necessary under the letter of intent and under general contract law. Even if we were persuaded that a duty of good faith obligat-

ed Allegheny to sign an agreement eventually, we could not seriously entertain the notion that it could be forced to sign the June 22 agreement as that agreement was fatally incomplete: on its face, the document not only leaves the purchase price blank, but also leaves blank the portion of the payment to be in cash and the amount to be carried as debt. In the letter of intent, Feldman argues that this is of no consequence because the parties had agreed as to how these figures should be calculated. Once again, we observe that the letter of intent cannot be construed as binding on the substantive terms of the transaction. The draft Feldman would have us elevate to a contract, and which would control the substantive terms, explicitly reserves the question of what accounting principles would be used. Feldman admits as much in paragraph 25 of his complaint. The parties tentatively agreed at the June 22 meeting that the purchase price would be based upon "the Closing Balance Sheet, which is to be prepared as provided for in Section 3.3 hereof." Section 3.3 provides that the Closing Balance Sheet would be prepared in accordance with generally accepted accounting principles; "provided, however, that for purposes of preparing the Closing Balance Sheet, and notwithstanding that the same may be contrary to generally accepted accounting principles," certain specialized accounting principles (to be set out in the appendices) "shall be applied" in computing certain assets and liabilities. The assets and liabilities subject to these special accounting principles included receivables, inventory, pension obligations, and warranty reserves. The June 22 draft fails to specify what these special accounting principles are. Two days later the parties found themselves negotiating over this very issue; and again a day after that. They were unable to reach accord. Having neither set a price, nor a mechanism to calculate a price, the draft cannot constitute a

---

**2.** Feldman believes his rights based on good faith are more compelling because he alleges that no material disagreements remained, the draft only awaiting signature. But the extent to which negotiations have in fact progressed is irrelevant to the right of withholding consent to a contract. *See Chicago Title,* 92 Ill.App.3d at 69–71, 47 Ill.Dec. at 671–73, 415 N.E.2d at 676–78.

contract; there has been no meeting of the minds. *Hintz v. Lazarus,* 58 Ill.App.3d 64, 15 Ill.Dec. 546, 373 N.E.2d 1018 (2d Dist. 1978); *Goldstick v. ICM Realty,* 788 F.2d 456, 461 (7th Cir.1986). Thus, we do not agree with Feldman's argument that the draft, the letter of intent and the oral discussions when considered together can elevate their dealings to the level of a binding contract.

### III.

■ Count two of the complaint alleged that the Moore group conspired with Allegheny officials to tortiously interfere with Feldman's contract rights and prospective economic advantage in dealing with Allegheny. The evidence at trial was insufficient to allow a jury to find for Feldman on either ground. All parties agree that to make out a claim for tortious interference with contract, the plaintiff must show (1) he had an enforceable contract; (2) of which the defendant knew; and (3) defendant induced the third party to breach that contract; (4) successfully; (5) resulting in damages. *Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986) (applying Illinois law). The elements for tortious interference with prospective economic advantage are similar: (1) plaintiff's reasonable expectation of entering into a business relationship; (2) known of by the defendant; (3) who intentionally interferes, preventing realization of that expectation. *Fishman,* 807 F.2d at 546. Both theories stem from some obligation upon which the plaintiff may reasonably rely. We have explained why the June 22 draft between Allegheny and Feldman did not give rise to any obligations. For that reason, any complaint for interference with that set of documents fails on its face. Feldman wisely has abandoned this line on appeal. Similarly, the letter of intent was no guarantee that an agreement would be reached. Consequently, complaints about the Moore group's competitive overtures winning it the Food Group companies are ended by the Illinois competitor's privilege. *See Candalaus Chicago, Inc. v. Evans Mill Supply Co.,* 51 Ill.App.3d 38, 9 Ill.Dec. 62, 366 N.E.2d 319 (1st Dist.1977); *Technical Representatives, Inc. v. Richardson–Merrell, Inc.,* 107 Ill.App.3d 830, 63 Ill.Dec. 668, 438 N.E.2d 599 (1st Dist.1982). Legitimate competitive efforts, such as indicating interest in and making offers to acquire a company, are not tortious interferences with business.

The only possible claim focuses solely on the letter of intent. The letter may give rise to some enforceable obligations, in particular, the right to some degree of exclusive bargaining for some time. One can imagine interference with this right, although the damages would be limited to those flowing from the loss of exclusivity; the defendant would be free to prove that the plaintiff's deal would have fallen through anyway. But tortious interference requires, among other things, knowledge of plaintiff's advantageous relation; conspiracy to tortiously interfere presumes the same. Feldman has failed to introduce any evidence from which a jury could conclude that the Moore group knew of his exclusive negotiations with Allegheny. His papers merely demonstrate that the Moore group had general knowledge of the letter of intent, but not its terms, and in particular, not that it contained any exclusivity provision. Feldman relies primarily on the fact that Moore emphasized that his offer was "all cash." From this Feldman makes a gigantic leap and concludes that Moore must have known enough about the letter to know it contemplated a mix of cash and debt. And if he knew this, he probably knew about the exclusivity provision as well. Several of these inferences are unsound. First, it is not uncommon in deals of this nature that part of the payment is debt. Moore would not have had to see the letter to expect this and it is natural to highlight the desirable characteristics of one's own offer. This point is particularly well illustrated by the fact that Moore had described his bid as a cash offer days prior to the letter of intent. Further, even if one assumes that Allegheny told the Moore group of the part of the letter outlining the transaction for purposes of facilitating a competing offer, why would they also mention the clause which might be interpreted as preventing such offers? As it turned

out, some exchange of information did occur between Allegheny and the Moore group, although Allegheny indicated it was not interested in pursuing matters while it was negotiating with Feldman. Moore could well have believed that this was only out of self-interest to avoid the expense of dual negotiations, or only out of honor and concern for business reputation. Finally, even if Moore suspected some contractual obligation bound Allegheny, no evidence indicates how he should have known the degree of exclusivity i.e. whether it even prohibited mere exchanges of information. In sum, Feldman would have us send this case to a jury on the chance that it might draw fanciful inferences about the knowledge of alleged conspirators. This is not a sufficient basis to avoid directed verdict. *Pistas v. New England Mutual Life Insurance Co.*, 843 F.2d 1038, 1040 (7th Cir. 1988).

### IV.

Perhaps realizing his theory based on the June 22 draft suffered from terminal flaws, Feldman attempted to allege a new theory in his complaint both shortly before trial, after his evidence on liability, and then again after directed verdict. His latter attempts also sought to divide in separate counts his conspiracy allegations from his plain vanilla tortious interference claims. The district judge denied all these requests. We review for abuse of discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1184 (7th Cir.1986).

■ Having found insufficient evidence to make out a prima facie case of tortious interference, any conspiracy claim based on tortious interference as the underlying wrong is similarly unsupported. *See Technical Representatives*, 107 Ill.App.3d at 833, 63 Ill.Dec. at 670–71, 438 N.E.2d at 601–02. The proposed division was therefore correctly refused as futile.

■ The new theory of liability would have focused on whether Allegheny had breached duties arising out of the letter of intent itself. We do not doubt that this route held more promise, although we express no opinion on its likelihood of success.[3] But the district court exercised sound discretion in denying the requests to amend on the eve of trial and then after presentation of the evidence. Leave to amend may be denied when it would prejudice the parties or cause undue confusion or delay in the litigation. *Textor v. Board of Regents*, 711 F.2d 1387 (7th Cir.1983). While Fed.R.Civ.P. 15 favors amendments when required by justice, it is not a license for carelessness or gamemanship. Parties to litigation have an interest in speedy resolution of their disputes without undue expense. Substantive amendments to the complaint just before trial are not to be countenanced and only serve to defeat these interests. The district court must consider the harm when deciding whether to grant leave.

■ Defense of a new claim obviously will require additional rounds of discovery, in all probability interview of new witnesses, gathering of further evidence, and the identification of appropriate legal arguments. All this necessarily takes time. The parties must have an opportunity for preparation if trial is to be meaningful and clear. Some delay of trial therefore is inevitable—a natural consequence of allowing claims to be brought at all. In this sense, delay alone is not a sufficient basis for refusing an amendment. On the other hand, amendments near the time set for trial may require postponement when the same allegations made earlier would have afforded ample time to prepare without delay. Plaintiff is not entitled to impede justice by imposing even reasonable preparation intervals *seriatim*. *Cf. INS v. Abudu*, —— U.S. ——, ——, 108 S.Ct. 904, 913, 99 L.Ed.2d 90 (1988) ("strong public interest in bringing litigation to a close as

---

**3.** One hurdle to recovery in this line of argument is the letter's statement that "this is not a binding agreement." Another is the letter's am-

biguity on what constitutes "discussions" or "negotiations."

promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases.") Whether it results from bad faith or mere absentmindedness, a district judge may act to deter such artificial protraction of litigation, and its costs to all concerned, by denying the amendment. *Zenith Radio Corp.*, 401 U.S. at 330, 91 S.Ct. at 802; *Bohen*, 799 F.2d 1184–85.

■ This litigation began in October, 1982, with Feldman's complaint. A month later, the complaint was amended. In April of 1985, the court entered the final pre-trial order. On December 3, 1986, four years after the last amendment, Feldman again amended his complaint. Finally, on February 4, 1987, three weeks before trial, Feldman attempted to amend his complaint once again to add his new theory of liability against Allegheny. He gave no explanation why this theory could not have been alleged sooner, nor can we imagine one, since the facts upon which it is predicated had been in the complaint all along. The district judge found the last minute amendment unacceptable in view of the duration of the prior proceedings, the numerous pre-trial conferences he had held, and the fact that everyone was set to go to trial in three weeks as planned. He noted that if he granted the motion, additional pleadings and discovery would likely ensue. While the underlying facts of the claim had been in Feldman's earlier complaints, it does not follow that the underlying facts of the defense to that new claim had also already been developed.[4] The district judge concluded that defendants would have been prejudiced by unjustified delay. It was within his discretion to refuse leave to amend. *See Knapp v. Whitaker*, 757 F.2d 827 (7th Cir.1985).

■ Having refused Feldman his belated amendment prior to trial, the judge stayed true to his decision and declined the same request during trial. The same rea-

sons support his conclusion as well. Distinguishing *Webb v. City of Chester*, 813 F.2d 824 (7th Cir.1987), the judge observed that the amendment would delay and confuse the trial, and would prejudice the defendants. We agree with his decision as a proper use of discretion.

We affirm the district court's directed verdict in favor of the defendants.

AFFIRMED.

---

4. Feldman asserts that the final pre-trial order put the binding quality of the letter of intent at issue. It did, but not as an independent theory of liability against Allegheny. Given the status of the complaint, the question was relevant to the allegation of interference with business rela-

tions, and to the "good faith duty to negotiate" argument against Allegheny. Allegheny had no reason to prepare a defense to the theory Feldman attempted to add on the basis of the pre-trial order.