714 F.2d 48
 CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Plaintiff-Appellee,
v.
CHICAGO TITLE AND TRUST COMPANY, not individually but as
Trustee of Trust No. 10-69000, under Trust
Agreement dated May 1, 1976, et al.,
Defendants-Appellants.
 No. 82-1775.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 18, 1983.
Decided Aug. 12, 1983.
Rehearing Denied Sept. 9, 1983.
 
 William J. Harte, Chicago, Ill., for defendants-appellants.
 Donald R. Harris, Jenner & Block, Chicago, Ill., for plaintiff-appellee.
 Before CUDAHY and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 Plaintiff-appellee Connecticut General Life Insurance Company sued defendants-appellants, who are real estate developers ("the Developers"), for breach of a real estate financing contract. The Developers disputed Connecticut General's claim, insisting that they had not accepted Connecticut General's offer and thus no binding contract had been created. The district court held that the Developers had accepted the offer. We affirm.
 
 I.
 
 2
 Connecticut General is an institutional mortgage lender which loans money for real estate development. The Developers are several individuals who build commercial real estate in the Chicago area. B.B. Cohen and Company ("B.B. Cohen") is Connecticut General's regional correspondent mortgage broker in Chicago. Benjamin Cohen, President of B.B. Cohen, acted as the Developers' agent in the loan negotiations with Connecticut General. In September 1976, B.B. Cohen, through Benjamin Cohen and on behalf of the Developers, submitted an application for commercial real estate mortgage financing to Connecticut General. On January 12, 1977, Connecticut General made a written offer to the Developers to provide such financing. Connecticut General's offer was in the form of a detailed commitment letter and provided that the Developers' "acceptance of the agreement must be accompanied by a fee of $600,000, in cash" or "a certificate of deposit in form and substance satisfactory to [Connecticut General], payable to [Connecticut General], and maturing no later than thirty days beyond the expiration of this agreement."[1] App. at 5B. The commitment letter also provided that "this agreement will not become effective unless on or before January 28, 1977, [the Developers] accept by signing the attached copy of this letter and mailing to [Connecticut General] the fee provided ... together with the signed copy." Id.
 
 
 3
 In response to Connecticut General's letter of January 12, the Developers wrote B.B. Cohen on January 28 and requested an extension of time until March 11, 1977. On March 2, 1977, the Developers wrote Connecticut General requesting modifications in the commitment letter. Among the requested modifications was one that would allow the Developers to pay the $600,000 fee by paying $300,000 in cash and giving Connecticut General a $300,000 letter of credit. Together with the March 2 letter, the Developers sent Connecticut General a check for $300,000.
 
 
 4
 Connecticut General and the Developers thereafter met and negotiated the modification requests. On May 16, 1977, Connecticut General made a new offer incorporating some of the requested modifications. The May 16 offer allowed the Developers until May 31 to accept and provided that the Developers could pay the $300,000 balance of the commitment fee in a certificate of deposit payable to, and satisfactory in form to, Connecticut General. Connecticut General did not modify its commitment letter so as to allow the Developers to give Connecticut General a $300,000 letter of credit in lieu of cash or a certificate of deposit.
 
 
 5
 The Developers' lawyer, David Malfar, responded in writing to Connecticut General's May 16 offer on May 31, 1977. Malfar asked for an extension of time for acceptance of the offer. Malfar did not mention the certificate of deposit requirement. Connecticut General again extended its offer, first to July 29, and then, at the Developers' request, to August 12, 1977.
 
 
 6
 The Developers signed their acceptance of Connecticut General's commitment letter on August 9, 1977, and delivered it to B.B. Cohen on August 11. At the Developers' request, the vice-president of B.B. Cohen, Jay Strauss, gave the Developers written acknowledgment of "receipt of your acceptance of [the] commitment," and advised the Developers that he would forward "this acceptance" to Connecticut General on their behalf. PX 20 (emphasis supplied).
 
 
 7
 The following day, on August 12, 1977, Strauss wrote to Connecticut General:
 
 
 8
 We are pleased to enclose copies of two amendments to the above captioned commitment, fully executed by the borrowers. These were delivered to us yesterday, satisfying the August 12 expiration date.
 
 
 9
 The borrowers have respectfully requested that the second $300,000 of the good faith deposit be allowed in a letter of credit issued by the Connecticut National Bank of Chicago rather than a certificate of deposit.
 
 
 10
 These funds will be forwarded as soon as you advise us of your decision in this matter.
 
 
 11
 PX 21 (emphasis supplied). On August 15, Connecticut General advised Strauss that the letter of credit proposal was not acceptable.
 
 
 12
 The issue before us is whether the Developers' signing and delivery of the commitment letters, absent contemporaneous delivery of the $300,000 fee in cash or in the form of a certificate of deposit, constituted an acceptance of Connecticut General's financing offer, thereby binding the Developers to deliver the remainder of the fee and to close the loan with Connecticut General. In other words, was payment of the balance of the fee a necessary part of the contract acceptance or was it to be part of the contract performance?
 
 II.
 
 13
 Illinois law governs the substantive issues presented here. Under Illinois law, the intent of the parties controls the question whether a contract exists. Of course when we speak of "intent," we are referring to a party's outward expression as manifesting his intention rather than to some secret and unexpressed intention. In measuring intent, the court must consider all relevant circumstances surrounding negotiation and execution of the document, as well as the language of the document itself. Evans, Inc. v. Tiffany & Co., 416 F.Supp. 224, 238 (N.D.Ill.1976); Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill.2d 234, 156 N.E.2d 513, 516 (1958).
 
 
 14
 Connecticut General's offer had two provisions regarding the manner in which the Developers could accept. Paragraph 22, entitled "Fees," provided:
 
 
 15
 Your acceptance of this agreement must be accompanied by a fee of $600,000 in cash. We will hold this fee without interest and free of trust as security for your obligations under this agreement. The fee will be returned to you if and when the loan closes. Should the loan fail to close for any reason, the fee will be retained by us as liquidated damages for our delivery of this agreement and our holding of funds for future disbursement.
 
 
 16
 Instead of submitting all of the fee in cash, you may submit a certificate of deposit in the amount of $300,000 representing one half of the fee, in form and substance satisfactory to us, payable to us, and maturing no later than 30 days beyond the expiration of this agreement (Condition 23). The certificate of deposit will be assigned to you if and when the loan closes. Interest on the certificate of deposit will be payable to you.
 
 
 17
 Paragraph 24, entitled "Acceptance," provided:
 
 
 18
 This agreement will not become effective unless ... you accept by signing the attached copy of this letter and mailing to us the fee provided in Condition 18 [sic Paragraph 22] together with the signed copy.
 
 
 19
 The key language of the two clauses is first, "Your acceptance of this agreement must be accompanied by a fee of $600,000 in cash," from paragraph 22, and second, "you accept by signing the attached copy of this letter and mailing to us the fee provided ...." Id. (emphasis supplied). Read literally, the language of paragraph 22 suggests that "acceptance" and paying the fee are separate acts, the latter being part of the Developers' required performance; the language of paragraph 24 suggests that paying the fee is part of the act of acceptance itself.
 
 
 20
 We think the district court's finding, based on all the relevant circumstances, "that neither the Developers nor CG viewed payment of the entire commitment fee as a condition to formation of the contract," or, in other words, that mailing the fee along with the signed commitment letters was not a required part of the acceptance, is not clearly erroneous. The Developers themselves, when they delivered the signed letters in August 1977, seemingly did not consider the payment to be part of their required acceptance. The letter of acknowledgment that the Developers had Strauss of B.B. Cohen write to them acknowledged receipt of the Developers' "acceptance of [the] commitment," (emphasis supplied) and advised the Developers that Strauss would forward "this acceptance" to Connecticut General on the Developers' behalf. Further, on August 12, 1977, one of the Developers had his brother write Continental Illinois National Bank, the Developers' construction lender, to notify Continental that the Connecticut General loan offer had been accepted:
 
 
 21
 To complete your files ... my brother, Ruben, has asked that I send to you copies of the August 1st letter from Connecticut General Life Insurance Company which has been accepted by all the parties in ownership. Also enclosed is a copy of the letter from B.B. Cohen & Co. acknowledging the acceptance on behalf of Connecticut General Life Insurance Company.
 
 
 22
 PX 22 (emphasis supplied). Similarly, the Developers' realty company advertised in October 1977 that Connecticut General was part of the Development. PX 31. Even though such representations to third parties that a contract has been formed may not be conclusive on the issue of intent, Chicago Title & Trust Co. v. Ceco Corp., 92 Ill.App.3d 58, 47 Ill.Dec. 663, 415 N.E.2d 668 (1st Dist.1980), we think the representations provide persuasive evidence in support of the district court's finding. Finally, the Developers' Agent, Benjamin Cohen, also apparently understood the Developers' signing and delivery of the commitment letter to have been an effective acceptance, since he wrote to the Developers on August 19, 1977, requesting payment of his fee for having secured the financing commitment which "has been accepted by you." PX 23. The fee was not paid, but this fact does not make Benjamin Cohen's apparent understanding of the situation irrelevant.
 
 
 23
 Moreover, the Developers never suggested to Connecticut General that their "acceptance" was in any way conditional upon Connecticut General's agreement to a letter of credit arrangement. Instead, Strauss's letter of August 12, 1977, stated that the "borrowers have respectfully requested that the second $300,000 of the good faith deposit be allowed in a letter of credit ... rather than a certificate of deposit." PX 21 (emphasis supplied). Such language, rather than being a counter-offer, can be understood as a "mere suggestion" so that we can "find an acceptance on the offeror's terms coupled with a further offer by the original offeree to modify that contract." E. Farnsworth, CONTRACTS § 3.21 at 158 (1982). See also RESTATEMENT (SECOND) OF CONTRACTS § 59 Comment a (1981) ("a definite and seasonable expression of acceptance is operative despite the statement of additional or different terms if the acceptance is not made to depend on assent to the additional or different terms .... The additional or different terms are then to be construed as proposals for modification of the contract."); id. § 61. Viewed in this light, we see the Developers' August 9 signing and subsequent delivery as binding them to perform on Connecticut General's terms. The subsequent letter then is a request for a modification of their duty, which Connecticut General was free to, and did, refuse. Connecticut General apparently did acquiesce in a limited modification of the Developers' duty inasmuch as they allowed the Developers an extension of time to pay the fee.
 
 
 24
 The Developers argue that the district court was wrong in finding that both parties were bound to perform as of August 11 because Connecticut General would not have agreed to be bound before it got the full commitment fee. But this in no way contradicts the conclusion that the Developers were bound. Instead, it appears that the payment of the fee was a "promissory condition" so that the Developers had a duty to see to it that the fee was paid, while payment of the fee was simultaneously a condition of Connecticut General's duty to perform. See E. Farnsworth, CONTRACTS § 8.3 at 547.
 
 
 25
 The Developers' conduct during the fall of 1977 with respect to the fee requirement is also consistent with the view that the fee payment was a performance requirement. The Developers made several attempts to satisfy the condition and sought from Connecticut General modification of the requirements contained in Connecticut General's commitment letter. Throughout this time it was never suggested that the fee payment was part of the acceptance. Instead, Strauss of B.B. Cohen wrote Connecticut General regarding the fee and indicated that the only thing preventing the Developers from immediately making the payment was the fact that their money was tied up in a certificate of deposit and an early cancellation of the certificate would result in a loss of interest. Strauss told Connecticut General in unconditional language that upon expiration of the certificate the Developers "will purchase a replacement which will be in the name of Connecticut General ...." PX 29 (emphasis supplied).
 
 
 26
 Therefore, we think that the district court did not clearly err in finding that payment of the fee was not part of the required acceptance. The payment of the fee instead went to the contract's performance.[2]
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 The $600,000 fee is a refundable commitment fee which Connecticut General requires as a demonstration of a borrower's good faith and intent to close a transaction in exchange for Connecticut General's commitment to hold loan funds available until closing. Connecticut General keeps the commitment fee until a loan closes and then refunds it to the borrowers, with accrued interest. If the loan does not close after a commitment is executed, Connecticut General retains the fee as liquidated damages for its delivery of the commitment and holding of funds for future disbursement
 
 
 [2]
 Appellants' argument that the contract was void for want of mutuality is not persuasive. In any event, the argument was waived by failure to raise it below. Stern v. United States Gypsum, Inc., 547 F.2d 1329 (7th Cir.), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977)