**WORLD CHAMPIONSHIP WRESTLING, INC., Plaintiff, Counterdefendant,**

v.

**GJS INTERNATIONAL, INC., d/b/a Today's Trendz, Defendant, Counterplaintiff.**

No. 98 C 3025.

United States District Court, N.D. Illinois, Eastern Division.

July 13, 1998.

John J. Dalton, Anthony C. Walsh, Troutman Sanders, L.L.P., Atlanta, GA, Keith M. Stolte, Brinks Hofer Gilson & Lione, Chicago, IL, for Plaintiff.

Matthew F. Kennelly, Theodore T. Poulus, Cotsirilos, Stephenson, Tighe, & Streicker, Ltd., Chicago, IL, Jules D. Zalon, Maplewood, NJ, for Defendant.

## MEMORANDUM OPINION AND ORDER

MORTON DENLOW, United States Magistrate Judge.

The Court conducted a three-day bench trial on June 24, 25 and July 1, 1998, to decide the following issues: (1) whether a contract exists between Plaintiff–Counterdefendant World Championship Wrestling, Inc. ("WCW") and Defendant–Counterplaintiff GJS International, Inc., d/b/a Today's Trendz ("Today's Trendz") that grants Today's Trendz a license to manufacture, sell, and distribute merchandise bearing WCW's trademarks and service marks, and if such a

contract does exist, what are its terms; and (2) whether Today's Trendz is otherwise authorized to manufacture, sell, and distribute merchandise bearing WCW's trademarks and service marks.

The Court holds that the parties agreed to and began operations under the terms of the September Deal Memo while they were negotiating the long form Merchandising License Agreement, which would ultimately govern their relationship. The parties never reached agreement on the terms of the Merchandising License Agreement. Accordingly, Today's Trendz had a license to sell WCW merchandise through May 14, 1998, when the September Deal Memo was terminated by WCW. Because no Merchandising License Agreement was ever agreed upon, Today's Trendz is no longer authorized to manufacture, sell and distribute merchandise bearing WCW's trademarks and service marks and is permanently enjoined from those activities.

The Court has carefully considered the testimony of the seven witnesses who testified in person, the one witness who testified by means of deposition, the numerous exhibits introduced into evidence, the written submissions by the parties, and the excellent closing arguments of counsel. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton,* 474 U.S. 104, 113–114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### *FINDINGS OF FACT*
### A. THE PARTIES.

1. WCW is a Georgia corporation which is a wholly owned subsidiary of Turner Broadcasting Systems, Inc. ("TBS"). WCW has its corporate offices in Atlanta, Georgia. WCW is in the entertainment business of arranging and promoting professional wrestling events and selling related merchandise, including T-shirts, hats, and posters. WCW organizes and promotes professional wres-tling events worldwide. WCW presents its wrestling matches in arenas, and broadcasts some events on pay-per-view telecasts, cable television, in syndication, and through the sale of home videos of its pay-per-view events. Casey Collins ("Collins"), WCW's Licensing Manager testified at the trial.

2. Today's Trendz is an Illinois corporation located in Bedford Park, Illinois. Today's Trendz is in the business of licensed manufacturing and distribution of novelty merchandise including the production and selling of posters, T-shirts, headwear, and other apparel. Today's Trendz operates its business by focusing on very few licenses at one time. Today's Trendz is a family business owned by Gus Stevens ("Stevens"). His two sons, Scott and Brian, his wife, and other family members are employed in the business. Stevens, his two sons, and Today's Trendz' attorney, Jules D. Zalon ("Zalon") testified at the trial.

3. Leisure Concepts, Inc. ("LCI") is a non-party to this litigation, but played a major role in the events giving rise to this dispute. WCW retained LCI as a licensing agent to negotiate with third parties for the licensing of WCW's trademarks. (Dx 15.) Faith Paige Wall ("Wall"), LCI's Director of Licensing, and Stella Guzman ("Guzman"), LCI's Manager of Contracts Administration, testified at the trial.

### B. JURISDICTION.

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332, and supplemental jurisdiction of the parties' state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

### C. PLAINTIFF'S TRADEMARKS.

5. Through the promotion, telecast, and advertising of its professional wrestling events, WCW has developed and promoted numerous trademarks and service marks, including various names, logos, and slogans related to its professional wrestling business. In addition, WCW has promoted the trademarks and service marks of the professional wrestlers and other entertainers to which WCW has an exclusive license.

6. The following federal trademark or service mark registrations are included among WCW's trademarks and service marks: Reg. No. 1,785,929 for the mark "WCW," identifying entertainment services; Reg. No. 2,089,414 for the mark "WCW MONDAY NITRO," identifying clothing; and Reg. Nos. 2,120,098 and 2,120,099 for the mark "NWO," identifying clothing and entertainment services, respectively. Today's Trendz does not contest the validity of WCW's trademarks or service marks.

7. Since 1988, WCW has sold merchandise, including T-shirts, hats, and posters, bearing WCW's trademarks and service marks.

## D. THE SEPTEMBER DEAL MEMO.

8. In early September 1997, Stevens decided to explore the possibility of obtaining an apparel license from WCW. At about the same time, WCW decided to bring its licensing activities in-house and hired Collins as its Manager of Licensing. Collins had taken the position with the understanding that he would retain an outside licensing agent to assist him. He immediately began speaking to LCI about the possibility of becoming WCW's licensing agent.

9. Stevens aggressively pursued an apparel license with WCW. He initially contacted Mike Weber ("Weber"), Director of Marketing at WCW, who told him WCW was bringing in Collins to handle licensing. Stevens later contacted Collins at WCW. Collins referred him to Alfred Kahn, LCI's CEO. Stevens spoke and wrote to both Kahn and Collins and sent them samples and brochures. (Dx 1–3.) Kahn turned the matter over to Wall to handle. Wall was hired by LCI as its Director of Licensing in August 1997, and she was assigned to solicit and develop apparel licenses for the WCW account. Although WCW and LCI did not finalize their agency arrangement until October 22, WCW gave LCI apparent authority to negotiate on its behalf prior to that date.

10. On September 17 Wall sent Stevens a WCW license application which he promptly completed and returned. (Dx 4.) Stevens spoke to Wall on September 18 and followed up the conversation with a written proposal for a license for apparel, posters, headwear, and T-shirt transfers. (Dx 5.) Stevens and Wall continued to negotiate possible licensing terms. Stevens confirmed some of these conversations in writing and he forwarded samples of merchandise and proposed terms. (Dx 5–7.)

11. In September, LCI's procedure was to prepare a Licensing Deal Memo ("Deal Memo") internally, send it to the prospective licensee (Today's Trendz), and then forward it to the licensor (WCW). LCI prepared a Deal Memo and sent it to Stevens on September 26 ("September Deal Memo"). (Dx 10.) The September Deal Memo set forth the major business terms to which Stevens and Wall had agreed. The September Deal Memo was approved by four people at LCI, including the legal department and the CEO, before it was sent to Stevens. (Dx 10.)

12. Stevens promptly executed and returned the September Deal Memo along with a $10,000 check payable to LCI. (Dx 11 and 12.) The $10,000 constituted a partial advance towards the $100,000 guarantee called for by the September Deal Memo.

13. After the executed September Deal Memo had been returned by Stevens to LCI, LCI forwarded it to WCW for its approval. Collins and his boss Weber approved the September Deal Memo and forwarded it to Nick Lambros ("Lambros"), WCW's Executive Vice President, for his review. Lambros had no disagreement with the business terms, but he held up signing the September Deal Memo until a written business plan was approved and a new Deal Memo procedure was adopted. Lambros wanted all Deal Memos to be preliminarily approved by WCW before being sent to licensees. He then wanted to reserve the right to give final approval after the licensee had signed the Deal Memo. In addition, WCW delayed approval of the September Deal Memo with Today's Trendz until it had finalized its own agreement with LCI on October 22. (Dx 15.) Under the agency agreement with LCI, WCW retained LCI to perform a number of services in its behalf, including soliciting licensees and negotiating licensing agreements. (Dx 15, p. 8.)

14. Stevens was not informed of Lambros' desire to change procedures. In fact, when Stevens spoke to Wall on October 22, she attempted to maintain his interest and enthusiasm and assured him in writing on WCW stationery that the September Deal Memo "should be signed in the next few weeks." (Dx 14.) On November 21, Wall sent a fax to Stevens, who was vacationing in Maui, advising him of "Great news! Posters will remain as part of the deal ... A style guide is being sent to you today, so you may begin prod. development ... You may proceed with designs and they will be reviewed promptly." (Dx 17.) A style guide is a compilation of photographs that can be used for design purposes.

15. At no time after the September Deal Memo was returned by Stevens did LCI or WCW ever indicate to Stevens that there was any disagreement with the terms of the September Deal Memo. Wall did request a slight modification to which Stevens agreed. After conducting a credit check of Today's Trendz, Wall requested that Stevens obtain a $75,000 letter of credit payable to WCW to secure a portion of the $100,000 guarantee. Stevens contacted his bank and arranged for the letter of credit to be issued. (Dx 21.)

16. Collins never alerted Stevens to any problems with the September Deal Memo. On November 24, Collins sent Stevens a letter expressing WCW's excitement over the opportunity to work together and promised to send the Merchandising License Agreement to Stevens for signature "in the next few weeks." (Dx 18.)

17. On or about December 1, LCI prepared the December Deal Memo under the new methodology and sent it to WCW. (Dx 20.) As Collins explained, the business points were the same as those contained in the September Deal Memo, with minor adjustments in certain dates to account for the delay which had occurred. The December Deal Memo was initialed by LCI and was then initialed by Collins, Weber, and Lambros on behalf of WCW under the heading preliminary approval. (Dx 20.) On December 9, Collins faxed the signature page to Guzman at LCI, who was responsible for forwarding contract documents to the parties

and maintaining the contract files. (Dx 23.) Guzman never sent a copy of the December Deal Memo to Stevens. No explanation was provided for this omission. Guzman filed the signature page from WCW along with the September Deal Memo executed by Stevens.

18. LCI's practice was to send out a proposed Merchandising License Agreement only after a Deal Memo had been approved by the parties. Collins assumed that the December Deal Memo had been forwarded to and executed by Today's Trendz when he sent the proposed Merchandising License Agreement to LCI in December. LCI assumed a Deal Memo had been agreed upon when it sent the proposed Merchandising License Agreement to Stevens on December 16. (Dx 25.) Stevens understood that the September Deal Memo had been approved when he received a draft of the Merchandising License Agreement in December. This understanding was reasonable because according to the September Deal Memo, the Merchandising License Agreement was to be sent out after "Licensor signs the Deal Memo." (Dx 10.)

## E. PRODUCT APPROVALS.

19. Today's Trendz worked through LCI to obtain product approvals for T-shirt designs. Following the style guides, Today's Trendz submitted T-shirt designs and received input and changes from LCI. (Dx 22, 27 and 28.) By December 31, T-shirt designs for NWO, Hollywood Hogan, and Sting had been approved. The September Deal Memo provided that "no product may be sold until final product and design approval is given by Licensor." (Dx 10.) The December Deal Memo, which was never sent to Today's Trendz, contained the following language: "It is understood that no product may be sold until final product and design approval is given by the Licensor, and no products may be sold or produced until the long-form License Agreement [Merchandising License Agreement] has been fully executed by the parties." (Dx 20.) This clause never became effective because it was never communicated to Today's Trendz and because WCW and LCI ignored this condition in their dealings with Today's Trendz.

20. Today's Trendz continued to submit product designs for approval up to the time WCW sought to terminate its relationship on March 3, 1998.

## F. MERCHANDISING LICENSE AGREEMENT NEGOTIATIONS.

21. While WCW and Today's Trendz were negotiating the Merchandising License Agreement, they began operating under the terms of the September Deal Memo. This conduct was similar to what had occurred between WCW and LCI, when LCI began to operate as WCW's licensing agent prior to execution of the agency agreement. The September Deal Memo contemplated that a Merchandising License Agreement would be executed consistent with the terms of the September Deal Memo and "conditions customarily found in merchandise license agreements." (Dx 10.) The September Deal Memo also provided that if WCW elected not to sign the Merchandising License Agreement, it "shall refund to Licensee any amounts paid by Licensee under this Deal Memo and neither party shall have any liability to the other." (Dx 10.) Collins drafted a proposed Merchandising License Agreement on behalf of WCW and forwarded it to Guzman. On December 16, Guzman prepared a form cover letter and forwarded four copies of the proposed Merchandising License Agreement to Stevens. (Dx 25.) Guzman's role as Manager of Contracts was to physically maintain contract documents, not to negotiate them. In her cover letter, Guzman set a December 31 deadline for execution by Today's Trendz. This deadline was ignored by WCW, which continued to encourage Today's Trendz' sales activities and to negotiate thereafter.

22. Upon receipt of the proposed Merchandising License Agreement, Stevens forwarded the document to his attorney, Zalon, who had represented Stevens' business interests since 1980. On December 31, Zalon sent a five-page letter to Guzman containing thirty-one comments and proposed changes to the proposed Merchandising License Agreement. (Dx 29.) Guzman forwarded Zalon's letter to Collins at WCW because he was the individual responsible for drafting the document on behalf of WCW. A copy was also sent to Wall, who was responsible for the negotiations on behalf of LCI. At no time did Collins ever speak to Zalon or Stevens to negotiate the terms of the Merchandising Licensing Agreement

23. In late December and early January 1998, while the Merchandising License Agreement was being negotiated, documents referring to Today's Trendz as a "licensee" were generated by LCI and WCW, sent to potential customers, and included in press packets. (Dx 19, 85 and 86.) In December, Stevens received a press packet from Collins in which Today's Trendz was listed as a WCW licensee for sweatshirts, T-shirts, caps, and posters. (Dx 19.) On January 7 LCI's Creative Director, Susan Simpson, sent Stevens a WCW style guide addressed "Dear Licensee." (Dx 30.) Today's Trendz understood that it was a licensee based on the September Deal Memo and proceeded to begin accepting orders and shipping products in early February. In January, LCI and WCW treated Today's Trendz as a Licensee and did nothing to discourage or dampen Today's Trendz expectations that a Merchandising License Agreement would be finalized and executed.

24. Collins and Wall reviewed Zalon's comments to the Merchandising License Agreement and both acknowledged that receiving comments was customary. Collins proceeded to prepare a second draft of the Merchandising License Agreement which Guzman forwarded to Stevens with a letter on January 16. (Dx 31.) The cover letter set a January 30th date for execution. Stevens forwarded the draft to attorney Zalon for his review. Once again, WCW ignored the January 30th deadline while encouraging Stevens to go forward with his sales activities.

25. The parties proceeded as if Today's Trendz was a licensee operating under the terms of the September Deal Memo while the Merchandising License Agreement was being finalized. Wall requested that Stevens provide her with a list of his sales representatives and others to invite to activities in connection with the Toy Fair, the major new toy product convention held in late January,

and the Magic Show, the major apparel convention held in Las Vegas in late February. Stevens complied. (Dx 34.) Stevens attended the party in New York and brought and displayed product samples of the Hulk Hogan and Sting T-shirts to WCW and LCI representatives. On January 21, LCI requested that Stevens submit an additional $10,000 advance payment "per your contractual agreement." (Dx 35.) Stevens' response on January 27 demonstrates that he was operating on the basis of the September Deal Memo while awaiting completion of the Merchandising License Agreement. (Dx 37.) On January 26, Today's Trendz arranged for its insurance broker to issue a certificate of insurance to cover WCW under Today's Trendz general liability policy as required by the September Deal Memo. (Dx 36.) In late January, Today's Trendz began to solicit orders and to represent to third parties that it had acquired rights to manufacture apparel, headwear, and posters for WCW. (Dx 44.) LCI and WCW referred prospective customers to Today's Trendz as their licensee. Collins told retailers they could call Today's Trendz to place an order.

26. Zalon reviewed the January draft of the Merchandising License Agreement from Collins and on January 23 forwarded a draft letter to Stevens setting forth five major problems. (Dx 40.) At this point, Stevens decided to personally take over the negotiations and on January 27, he faxed the Zalon draft letter to Wall with a note: "As per our conversation enclosed is my attorney's comments. Let's talk and hopefully clear this today." (Dx 11.)

27. According to Stevens, he negotiated these points with Wall and they finalized an agreement. Wall acknowledges that negotiations took place, but denies that agreement was reached. The Court finds that although the parties were operating under the September Deal Memo, no final agreement was reached on the terms of the Merchandising License Agreement in this conversation or later. As of the middle of January, the parties were engaged in good faith negotiations seeking to finalize the document. As part of these discussions, Stevens requested that the licensing agreement be expanded to include the Asian/Japanese market for an additional guarantee of $50,000. No agreement was reached on the issue of the Asian/Japanese market. Two other major issues were outstanding. First was a definition of the marketing channels to which Today's Trendz would be allowed to sell. The September Deal Memo limited Today's Trendz to the following distribution channels: (1) department stores; (2) specialty stores; and (3) mid-tier stores. (Dx 10.) In negotiating the Merchandising License Agreement, Today's Trendz sought to expand the authorized channels of distribution to include "all normal channels of commercial distribution excluding mass market discounters." (Dx 40.) This definition was unacceptable to WCW because it was overly broad. Although Stevens may have been willing to accept WCW's definition, he never communicated this fact to WCW or LCI. His communications and those of Zalon sought a broader definition. Second was the issue of exclusivity. Although the September Deal Memo was clear that Today's Trendz had a non-exclusive license, Today's Trendz sought assurances that it would have an exclusive license with respect to the channels of distribution to which it was authorized to sell. These two issues had not been finalized for purposes of the Merchandising License Agreement although they were clear in the September Deal Memo.

28. During the same January 27th conversation, Stevens confirmed with Wall his intention to attend the Super Show and Magic Show and to take orders and to begin shipping merchandise. She agreed.

29. Wall contacted Collins with the comments from her discussions with Stevens, and Collins prepared a third version of the Merchandising License Agreement with Today's Trendz. This document was never sent to Stevens because of intervening events by which WCW decided to terminate its relationship with Today's Trendz.

## G. CONVENTIONS.

30. During February 1998 two major conventions took place at which Today's Trendz was showing and selling WCW apparel.

31. The first of these shows was the Atlanta Super Show at which Today's Trendz displayed and took orders for WCW T-shirts and hats. Prior to the show, Brian Stevens went to WCW's offices and picked up promotional materials from Collins for use at the show. Collins was aware that Today's Trendz was promoting and selling WCW merchandise at the Super Show.

32. From February 18–20, Today's Trendz exhibited and took orders for WCW apparel at the Las Vegas Magic Show which is the largest annual apparel convention in the country. Both Wall and Collins attended the show, observed Today's Trendz sales efforts, and were aware that Today's Trendz was taking orders for WCW apparel. (Dx 89–92.) At no time during the convention did Wall or Collins ever tell Stevens or his sons that they would not be able to fill the orders without a fully executed Merchandising License Agreement. The conduct of Wall and Collins was consistent with the parties understanding that Today's Trendz was a licensee, and that it was operating under the September Deal Memo while the parties were working towards completion of the Merchandising License Agreement, which would replace the September Deal Memo and cover the period through December 31, 1999. Both parties expected the Merchandising License Agreement to be finalized and both parties understood that in the event a Merchandising License Agreement was not executed, WCW had the option of terminating the September Deal Memo.

33. Stevens and his two sons held a breakfast meeting with Collins at the Magic Show during which Collins expressed his pleasure with the merchandise being displayed and sold by Today's Trendz. Stevens discussed with Collins a possible 40,000 dozen T-shirt sale to Family Dollar Stores, which Stevens claimed he turned down because Family Dollar was a discounter. All systems were go for the parties by the time the Magic Show had concluded. Collins encouraged Stevens to go out and buy as many blank T-shirts as possible because they were all going to make a lot of money. WCW had seen the marketing efforts put forth by Today's Trendz and was pleased with the quality of the merchandise and the aggressive effort and favorable reception to its initial apparel offerings. Stevens was excited because he had directed his company to focus exclusively on the WCW marketing effort and he looked forward to a successful merchandising program as one of WCW's principal apparel licensees. The euphoria soon disappeared and the situation promptly deteriorated.

## H. FLEA MARKET INCIDENT AND DECISION TO TERMINATE.

34. Following the Magic Show in Las Vegas, Collins flew to San Francisco to attend a WCW event. When he arrived he was greeted by a WCW representative who claimed that he had seen WCW T-shirts with Today's Trendz' tags being sold at a flea market. Collins went to the flea market with Lambros and a third WCW employee and personally observed T-shirts with WCW approved designs and Today's Trendz' tags being sold. Collins was irate and upon his return to Atlanta called Wall to find out what was going on.

35. Wall immediately called Stevens to complain that WCW T-shirts were being sold at a flea market and to obtain an explanation from Stevens. Stevens explained that while he made every effort to prevent distribution to vendors such as flea markets, he could not control resale by his customers. Wall did not express any objection to Stevens that T-shirts were being sold, but only to the fact that they were being sold at a flea market, which was inconsistent with the September Deal Memo's distribution channels.

36. Stevens promptly faxed his sales representatives to alert them of the problem and to remind them that "our contract prohibits Today's Trendz and its personnel from supplying or selling to anyone who retails at flea markets, fairs, festivals, wrestling or similar internet/mail order or retailers who are classified as discounter. Your compliance is *mandatory*, . . ." (Dx 57.)

37. Wall reported back to Collins on the substance of her conversation with Stevens. Collins felt uneasy because he was concerned that Stevens was not able to control the channels of distribution, which was an ex-

tremely important issue for WCW under its business plan.

38. On February 25, Zalon also spoke to Wall in an effort to assure her that Stevens was a competent and responsible businessman. In that conversation, Wall did not express any objection to Today's Trendz sale of WCW apparel, but only to the channel of distribution.

39. Between February 25 and March 3, WCW made the decision that it no longer desired to do business with Today's Trendz and directed its counsel to take appropriate action to terminate its relationship under the December Deal Memo and to cease further negotiations regarding the Merchandising License Agreement.

40. On March 3, in-house counsel at WCW sent a letter to Stevens terminating the December Deal Memo "since the parties have been unable to come to terms agreeable to WCW for a long form [Merchandising] License Agreement." (Dx 58.) The letter also directed Today's Trendz to "immediately discontinue any production, sale or distribution of the Authorized Articles." (Id.)

41. On March 10, Zalon responded on behalf of Today's Trendz asserting that "Today's Trendz has an enforceable contract with WCW, and has no intention of abjuring any of its rights." (Dx 60.)

42. Efforts to reach an amicable resolution did not prove successful, and WCW once again demanded that Today's Trendz immediately discontinue any production, sale, or distribution of WCW items. (Dx 9.) Today's Trendz refused to comply with WCW's demand. On May 14, WCW refunded $10,000 to Today's Trendz. (Dx 74.) On May 15, WCW returned an uncashed check for $15,000 representing the second installment of the advance and an uncashed check for $27,520.02 representing a purported royalty payment. (Px 17.) Today's Trendz has continued to sell WCW merchandise based on Zalon's advice that an enforceable contract was still in place.

## I. THE LITIGATION.

43. WCW filed suit on May 15. WCW filed a motion for preliminary injunction and for expedited discovery. WCW filed an eight count complaint for federal and common law trademark infringement, violation of federal and state dilution laws, federal and common law unfair competition, violation of the Illinois Uniform Deceptive Trade Practices Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act. Today's Trendz filed a two count counterclaim for breach of contract and intentional interference with prospective business advantage. By agreement of the parties, it was decided to dispense with a hearing on a preliminary injunction and to bifurcate proceedings. Because there is no question that Today's Trendz was selling merchandise which contained protectable WCW marks, the principal issue is whether Today's Trendz had a legal basis by which to sell and to continue to sell WCW merchandise. Following a period of expedited discovery, trial was held.

## CONCLUSIONS OF LAW

44. Today's Trendz raises three alternative theories by which it claims it should prevail: (1) that the September Deal Memo constitutes an express contract; (2) that the September Deal Memo is a contract implied in fact; and (3) that WCW is estopped to deny that Today's Trendz was authorized to manufacture, distribute, and sell WCW merchandise. The Court will discuss the contract theories together and will then discuss promissory estoppel. The parties agree that Illinois law applies to the issue of whether a contract was formed and whether promissory estoppel exists.

## J. BURDEN OF PROOF.

45. Today's Trendz has the burden of proving that it has a contract or right to sell WCW merchandise. Under the Lanham Act, a plaintiff claiming trademark infringement bears the burden of proof. *See Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 380 (7th Cir.1996). However, the issue in this trial is whether Today's Trendz had an agreement with WCW to manufacture products with WCW trademarks. Because Today's Trendz asserts that it has a contract with WCW, the burden of proof shifts to Today's Trendz for two reasons. First, in

trademark cases, "acquiescence or permission is an affirmative defense," shifting the burden of proof to the party raising the defense. *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1168 (C.D.Cal.1986) (*citing* JEROME GILSON, TRADEMARK PROTECTION AND PRACTICE § 8.12(12)(e) (1985)), *aff'd* 830 F.2d 197 (9th Cir.1987); *see also* CHARLES E. McKenney, FEDERAL UNFAIR COMPETITION: LANHAM ACT § 43(a) § 9.10, p. 9–37 to 9–44 (1989). Second, under Illinois law, "a party seeking to enforce an agreement has the burden of establishing the existence of the agreement." *Reese v. Forsythe Mergers Group, Inc.*, 288 Ill.App.3d 972, 224 Ill.Dec. 647, 682 N.E.2d 208, 213 (1997). Today's Trendz also carries the burden of proof in its promissory estoppel claim. *Goldberg & Assoc. v. Collins Tuttle & Co., Inc.*, 264 Ill. App.3d 878, 202 Ill.Dec. 367, 637 N.E.2d 1103, 1108 (1994). Thus, the Court holds that Today's Trendz has the burden of proving by a preponderance of the evidence that either: (1) a contract exists that grants Today's Trendz a license to manufacture, sell, and distribute merchandise bearing WCW's trademarks and service marks; or (2) Today's Trendz is otherwise authorized to manufacture, sell, and distribute merchandise bearing WCW's trademarks and service marks. Although the burden of proof constitutes an interesting legal issue, the Court would have reached the same factual conclusions and result if WCW had the burden of proof. Furthermore, the issue of who has the burden of proof on the remaining issues in the case will be dealt with in future proceedings.

## K. THE CONTRACT.

■ 46. The September Deal Memo is an enforceable contract. "Under Illinois law, the intent of the parties controls the question whether a contract exists." *Conn. Gen. Life Ins. Co. v. Chicago Title and Trust Co.*, 714 F.2d 48, 50 (7th Cir.1983); see also *Cobb–Alvarez v. Union Pacific Corp.*, 962 F.Supp. 1049, 1053 (N.D.Ill.1997). Intent refers to "a party's outward expression as manifesting his intention rather than to some secret and unexpressed intention." *Conn. Gen. Life Ins. Co.*, 714 F.2d at 50. "In measuring intent, the court must consider all relevant circumstances surrounding negotiation and execution of the document, as well as language of the document itself." *Id.* "To form a valid contract between two parties, there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting." *Reese*, 224 Ill.Dec. 647, 682 N.E.2d at 213.

47. The September Deal Memo contains the essential terms of the agreement between the parties. (Dx 10). The parties agreed to the following principal terms: TBS through its wholly-owned subsidiary, WCW, agreed to provide Today's Trendz with a nonexclusive WCW license for screen-printed adult T-shirts, sweatshirts, embroidered baseball caps, knit hats, bandanas, and flocked/lithograph posters. The territory covered by the license was the U.S., its territories and possessions and U.S. military installations. Today's Trendz was to pay 10% royalty based on net sales. Today's Trendz agreed to a $100,000 guarantee including a $10,000 payment upon signing. This agreement was later modified to include a $75,000 letter of credit to secure the guarantee which Today's Trendz provided. The license was for the following distribution channels: (1) department stores; (2) specialty stores; and (3) mid-tier stores. The licensed articles were to be of the highest quality, meet WCW's standards for approval and be of substantially the same or better quality as the samples previously submitted by Licensee. Today's Trendz was not authorized to sell any product until WCW or LCI gave its final product and design approval.

48. The Court finds that ambiguity in the September Deal Memo is manifested in the following two clauses: (1) "If Licensor signs the Deal Memo, Licensee and Licensor shall enter into a long-form [Merchandising] License Agreement containing the terms and conditions set forth in this Deal Memo as well as such other terms and conditions customarily found in merchandise licensing agreements"; and (2) "If Licensor elects not to countersign this Deal Memo within ninety (90) days of Licensee's signature or elects not to sign the long-form [Merchandising] License Agreement, Licensor shall refund to

Licensee any amounts paid by Licensee under the Deal Memo and neither party shall have any liability to the other." (Dx 10.)

49. The obligation to deal in good faith is implied by Illinois law into every contract and breach of that duty is simply a breach of the underlying contract. *LaScola v. U.S. Sprint Comm.*, 946 F.2d 559, 565 (7th Cir.1991). The Court interprets the conflicting provisions to mean that the parties agreed to negotiate in good faith to reach a comprehensive Merchandising License Agreement containing the September Deal Memo terms and other customary terms found in merchandise license agreements. In the event that no comprehensive agreement could be reached following such good faith negotiations, WCW could terminate the September Deal Memo by refunding any advances received.

50. The mutual assent of the parties to the September Deal Memo was manifested by their conduct, including: (1) Stevens' execution of the September Deal Memo; (2) Wall's assurances to Stevens on October 22 that the September Deal Memo "should be signed in the next few weeks" (Dx 14); (3) Wall's letter to Stevens on November 21 telling him that posters will be part of the deal and advising Stevens to submit designs for prompt review; (4) Collins' November 24 letter to Stevens advising him that the Merchandising License Agreement would be sent out in the next few weeks for signature; (5) the delivery by WCW and negotiation of the Merchandising License Agreement which WCW and LCI explained takes place only after a deal memo is agreed upon; (6) product approvals by WCW and LCI of three T-shirt designs submitted by Today's Trendz; (7) WCW and LCI's referral of prospective customers to Today's Trendz for the purpose of placing orders; (8) WCW and LCI's representation to Today's Trendz and third parties in its press packets that Today's Trendz was a "licensee"; (9) Stevens' phone call with Wall on January 27 in which she agreed that it was appropriate for Today's Trendz to show WCW apparel, take orders, and begin shipping merchandise at two major trade shows; (10) Collins and Wall both attended the Magic Show and never objected to any activity by Today's Trendz to display WCW merchandise and to accept orders for sale; (11) Collins' breakfast meeting with Stevens and his sons during which Collins told them to go out and buy blank T-shirts for their mutual benefit; (12) WCW's retention of the $10,000 advance until May 14; (13) the failure by WCW or LCI to at any time prior to March 3 advise Today's Trendz that they believed the September Deal Memo to be inoperative; (14) the express agreement of the parties to the major business points set forth in the September Deal Memo; and (15) other action taken in conformity with the September Deal Memo by the parties including Today's Trendz' submission of a letter of credit and insurance binder.

51. Because the September Deal memo contains essential terms to which the parties mutually assented, the September Deal Memo constitutes a contract under which the parties operated while they negotiated a comprehensive Merchandising License Agreement.

52. Furthermore, although the September Deal Memo is not a letter of intent, it has some similar characteristics which provide a useful analogy. The Illinois Supreme Court has explained the law regarding letters of intent as follows:

> The fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where it is clear that the ultimate contract will be substantially based upon the same terms as the previous document. If the parties intended that the document be contractually binding, that intention would not be defeated by the mere recitation in the writing that a more formal agreement was yet to be drawn. However, parties may specifically provide that negotiations are not binding until a formal agreement is in fact executed. If the parties construe the execution of a formal agreement as a condition precedent, then no contract arises unless and until that formal agreement is executed.

*Quake v. American Airlines*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 993 (1990) (internal quotations and citations omitted).

Although the parties contemplated and were working toward a more formal agreement, they chose to begin doing business under the September Deal Memo during the pendency of their negotiations. This was their right.

53. Therefore, the September Deal Memo constitutes a contract under which the parties operated until May 14, 1998, the date WCW returned the $10,000 advance.

## L. PROMISSORY ESTOPPEL THEORY.

54. Once it is established, either by an admission of a party or by judicial finding, that there is in fact an enforceable contract between the parties, and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel. *Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 207 Ill.Dec. 690, 648 N.E.2d 146, 150 (1995). Although it is unnecessary to reach a decision on promissory estoppel due to the fact that the Court finds that there was a valid contract, the Court holds, in the alternative, that WCW is estopped to deny that Today's Trendz was authorized to manufacture, distribute, and sell WCW merchandise.

55. Promissory estoppel is an equitable doctrine that allows the court to infer a contract where none would otherwise exist, with an underlying purpose of protecting innocent parties. *Goldberg*, 202 Ill.Dec. 367, 637 N.E.2d at 1108. The elements of promissory estoppel are: (1) an unambiguous promise; (2) with reliance on the promise by the promisee; (3) with the promisee's reliance being expected and foreseeable by the promisor; and (4) with the promisee in fact relying on the promise to his detriment. *Id.; see also Quake*, 152 Ill.Dec. 308, 565 N.E.2d at 1004.

56. Today's Trendz received through both the terms of the September Deal Memo and the collective conduct of WCW and LCI representatives an unambiguous promise that Today's Trendz was licensed to manufacture WCW merchandise. The same conduct which demonstrated mutual assent to the contract manifested WCW's promise to Today's Trendz.

57. Today's Trendz relied upon WCW's promise in the following fashion: (1) creating and submitting designs for approval; (2) sending samples and prebooking orders; (3) accepting orders and shipping products; (4) attending trade shows in Atlanta and Las Vegas to promote the WCW product line; and (5) generally turning the entire business of Today's Trendz towards the advancement of WCW products. Today's Trendz' reliance should have been expected and foreseeable to WCW, and Today's Trendz relied to its detriment.

58. WCW is estopped to deny that Today's Trendz was authorized to manufacture, distribute, and sell WCW merchandise through March 3, 1998, the date of WCW's termination letter. Today's Trendz cannot claim reasonable reliance after that point. After March 3, Today's Trendz relied upon the advice of its counsel for its decision to continue to manufacture and sale.

## M. THE STATUTE OF FRAUDS.

59. Under Illinois law the statute of frauds provides that:

> No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1 (West 1993).

60. The Statute of Frauds was designed to protect parties against claims of agreements that cannot be performed within one year where there is no writing signed by the party to be charged with such agreement. *McInerney v. Charter Golf, Inc.*, 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1351 (1997). Under Illinois law, promissory estoppel may not be applied to allow recovery where the Statute of Frauds bars contract claims. *Peoria Assoc. Limited Partnership v. Best Buy, Inc.*, 995 F.Supp. 823, 824 (N.D.Ill.1997); *see also Dickens v. Quin-*

*cy College Corp.*, 245 Ill.App.3d 1055, 185 Ill.Dec. 822, 615 N.E.2d 381, 386 (1993).

61. The September Deal Memo and subsequent correspondence between the parties satisfies the Statute of Frauds because they contain the agreement's essential terms. *See Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir.1992) (applying Illinois law).

62. The Statute of Frauds is also satisfied by the partial performance described in paragraph 50. *See Genin, Trudeau & Co. v. Integra Dev. Int'l*, 845 F.Supp. 611, 619 (N.D.Ill.1994).

## N. CONCLUSION.

63. The parties agreed to the terms of the September Deal Memo, with minor modifications, and began operations under its terms. The parties did not reach agreement on terms of the Merchandising License Agreement. WCW terminated the September Deal Memo on May 14, at which time the license created by the September Deal Memo was terminated. **Accordingly, Today's Trendz is permanently enjoined from manufacturing, distributing and selling WCW merchandise from the date of this order.**